IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LABAT-Anderson Incorporated,<br>8000 Westpark Drive<br>Suite 400<br>McLean, Virginia, 22102<br><br>Plaintiff,<br><br>v.<br><br>The United States of America,<br><br>AND<br><br>Donald H. Rumsfeld,<br>Secretary of Defense,<br><br>Defendants. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This complaint is brought by LABAT-Anderson Incorporated ("LABAT") against the United States of America, and Donald H. Rumsfeld, Secretary of Defense for: (1) declaratory judgment that Defendants' conversion of distribution services performed by LABAT at the Defense Distribution Depot in Cherry Point, North Carolina ("DDCN") to performance by government personnel without performing a required cost comparison is arbitrary, capricious, and in violation of statute, executive order, and agency regulations and procedures; and (2) an injunction prohibiting such an illegal conversion to government operation. The relief sought is necessary to protect Plaintiff from serious and irreparable harm that has resulted and will result from Defendants' conduct, as more fully set forth below.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 in that this action arises under the laws of the United States, including 10 U.S.C. § 2462, and the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Plaintiff also invokes this Court's authority under 28 U.S.C. §§ 2201-2202.

2.  Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) in that the Defendants' reside in this district.

## THE PARTIES

3.  Plaintiff, LABAT, is a Virginia Corporation, with corporate offices at 8000 Westpark Drive, Suite 400, McLean, Virginia, 22102. LABAT is a worldwide consulting firm specializing in information systems and services, environmental services, facilities management services, and litigation support. Among other operational locations, the company provides distribution services for the DDCN.

4.  Defendant the United States of America acted and is acting through federal agencies, officials, and employees. Defendant, Donald H. Rumsfeld, Secretary of Defense, acted and is acting in his official capacity personally or through his agents, including Michael W. Wynne, Acting Under Secretary of Defense for Acquisition, Technology and Logistics, Vice Admiral Keith W. Lippert, Director of the Defense Logistics Agency ("DLA"), Colonel Michael J. Lally, Director of the Defense Distribution Center ("DDC"), and Commander Joseph T. Sermarini of the DDCN.

5.  DDC is a component of the DLA, which is a Department of Defense ("DoD ") defense agency. DDC is located at 2001 Mission Drive, New Cumberland, PA, 17070-5000. DDC is headquarters for 25 DLA Distribution Centers located

throughout the United States, Europe, Japan, and Hawaii, including Cherry Point, North Carolina. The DLA distribution operation responsibilities include receipt, storage, issue, packing, preservation, worldwide transportation, in-transit visibility and redirecting en-route, when required, of all items of supply placed under its accountability by the DLA and the military services.

## STATEMENT OF FACTS

### A.  The A-76 Competition and Contract Award.

6.  On January 28, 2000, the Defense Supply Center, Columbus, Ohio issued a Request for Proposals ("RFP") in connection with a cost comparison process under Office of Management and Budget Circular No. A-76 (revised 1999) (Aug. 4, 1983) ("A-76") to solicit private sector proposals to perform distribution functions at the DDCN that were at the time being performed by government personnel.

7.  DDCN is a government "depot" that stores and issues items of supply, including principally aviation related spare parts, to support the 2nd Marine Air Wing, numerous Marine Aviation Logistics Squadrons, Marine Corps Air Station at Cherry Point, the largest Marine Air Station in the world, and the Naval Air Systems Command's Naval Aviation Depot at Cherry Point.

8.  The RFP contained a "Performance Work Statement" ("PWS") that called for the following distribution services:

- Basic storage, issue, and receipt functions relating to mission stock items;
- Preservation, packaging, packing, and marking of mission stock items;
- Special functions, including on demand wood container fabrication; and
- Other services related to providing distribution and logistics support, such as implementation of an Inventory Accuracy Improvement Plan.

9. LABAT's proposal was selected as providing the "best value" to the government among the various private sector proposals submitted in response to the RFP.

10. Pursuant to A-76 procedures, a Government Most Efficient Organization ("MEO") proposal to meet the PWS requirements was prepared by the employees at DDCN and was evaluated during the A-76 cost comparison process.

11. In a direct head-to-head cost comparison, LABAT's proposal was selected over the MEO's proposal because it met the requirements of the PWS at a lower cost to the government.

12. On May 11, 2001, LABAT was awarded a firm fixed price, indefinite quantity contract, with an estimated value of $11,179,952. Contract No. SP0710-01-D-7002 ("the contract") was for a base period of three years and an option period for an additional two-year period of performance.

13. Both the union (International Association of Machinists & Aerospace Workers) and individual employees of DDCN appealed the A-76 cost comparison that led to the selection of LABAT. Both appeals were denied.

14. LABAT began transition activities in early August 2001 and assumed operational responsibility on December 1, 2001. The contract's base period of performance will conclude on December 1, 2004.

### B. DoD Requirements Pertaining to Reliance on the Private Sector.

15. There are a variety of laws applicable to DoD agencies that require reliance on the private sector for services, provided that such services do not involve "inherently governmental" functions, if such services can be obtained from the private sector at a lower cost.

\\\DC - 80784/0007 - 2002521 V2

- 4 -

- 5 -

16. Under 10 U.S.C. § 2462 (2004), DoD agencies are required to procure supplies and services from a private sector source if that source can provide the supply or service at cost that is lower than the cost at which DoD can provide the same item of supply or service.

17. Executive Order 12615, "Performance of Commercial Activities" (Nov. 19, 1987) (the "Executive Order") provides that each executive department and agency shall, to the extent permitted by law, ensure that the federal government's requirements for commercial activities are provided by private industry, except where statute or national security requires governmental performance or where private industry's costs are unreasonable.

18. A "commercial activity" is "an activity that provides a product or service obtainable (or obtained) from a commercial source." 32 C.F.R. § 169.3; see also OMB Circular A-76 (revised) (May 29, 2003) at D-2 ("a recurring service that could be performed by the private sector.").

19. Under DoD's Commercial Activities Program regulations, 32 C.F.R. Part 169, DoD components are directed to rely on commercially available sources to provide commercial products and services except when required for national defense, when no satisfactory commercial sources are available, or when in the best interests of direct patient care. 32 C.F.R. § 169.4(d). This regulation also prohibits DoD components from converting services to in-house personnel if the products or services can be procured more economically from commercial sources. Id.

20. The performance of distribution services at the DDCN is a "commercial activity."

21. These DoD regulations also provide that the only time a DoD component is permitted to establish an "interim in-house operation" is in the event the contractor is terminated for default. 32 C.F.R. § 169a.4(h).

22. In addition, the procedures provide that in the event "contract cost becomes unreasonable or performance becomes unsatisfactory, the requirement must be resolicited." 32. C.F.R. § 169a.10.

23. DoD regulations at 32 C.F.R. Part 169, provide that Defendants must implement the procedures of OMB Circular A-76 (2003) in connection with any decision to contract out or perform in-house any DoD commercial activities.

24. OMB Circular A-76 (2003) was promulgated pursuant Reorganization Plan No. 2 of 1970 (31 U.S.C. § 1111); Executive Order 11541; the Office of Federal Procurement Policy Act (41 U.S.C. § 405); and the Federal Activities Inventory Reform Act of 1998 (P.L. 105-270). Section 5.d states "[b]efore government personnel may perform a new requirement, an expansion to an existing commercial activity, or an activity performed by the private sector, a streamlined or standard competition shall be used to determine whether government personnel should perform the commercial activity."

### C. Contracting Officer's Decision to Convert to In-House Personnel.

25. On September 30, 2004, the DDC Contracting Officer, Ms. Renee Cairo-Iocco, announced the Government's intention not to exercise the contract's two-year performance option. Specifically, in a letter of the same date, Ms. Cairo-Iocco stated "[c]onsidering price and other factors, exercising this option is not considered to be the most advantageous method of fulfilling the Government's need." Malinowski Declaration at Exhibit A. Instead, she determined that "resolicitation of these services is necessary." Id.

26. The Contracting Officer determined that "[i]n order to cover these services until a new contract is awarded [DDC] shall convert the [DDCN] operations to an Interim Government Operation (IGO), effective December 1, 2004." Id. A transition team was scheduled to arrive at DDCN during the week of October 4, 2004, to meet with members of the Continuing Governmental Activity (CGA) and LABAT's Site Manager to discuss how to proceed.

27. The Contracting Officer's notice provided no further explanation or justification for her decision to convert DDCN operations to in-house personnel.

28. Importantly, LABAT was not terminated for default nor were any specific performance issues cited in support of the government's decision.

29. Upon the expiration of LABAT's contract, Defendants, through implementation of the Contracting Officer's decision, intend to convert the DDCN operations to an unauthorized Interim Government Operation.

30. The September 30, 2004 letter announcing the decision to convert the distribution services at DDCN to government performance did not specify under what authority the Government was unilaterally converting DDCN operations to in-house personnel.

31. The decision to convert the DDCN distribution services to government performance was not required for national defense or national security, nor was it necessitated because of the absence of a satisfactory commercial source. The decision also clearly had nothing to do with of the "best interest of patient care."

32. No standard or streamlined competition in accordance with OMB Circular A-76 (2003) was conducted by the government to support the unilateral conversion decision.

33. Without some form of competition or cost comparison under OMB Circular A-76 (2003), the Contracting Officer had no factual predicate upon which to conclude that government performance is less costly than private sector contractor performance.

34. Not only has no competition or cost comparison been undertaken to date, there has been no indication from the government as to when or how the DDCN operations will be recompeted.

35. Because the government's decision to convert performance of distribution services from contractor to government performance was not justified on the basis of a competition/cost comparison or under any other valid legal bases, the Contracting Officer's decision to convert the DDCN operations to an Interim Government Operation violates 10 U.S.C. § 2462, Part 169 of the DoD Regulations, Executive Order 12615, and OMB Circular A-76 (2003) – all of which prohibit government agencies from conducting commercial activities or converting commercial activities to in-house performance if such activities can be performed at a lower cost by the private sector.

36. On September 30, 2004, LABAT responded to the Contracting Officer's decision and highlighted the significant cost and operational impacts of the government's unexpected decision to convert the DDCN operations to performance by in-house personnel. LABAT even suggested an alternative approach that would provide the government a cost-effective, interim solution while it began the process of recompeting the distribution services at DDCN.

37. By letter dated October 6, 2004, counsel for LABAT requested that the DDC reconsider the Contracting Officer's decision and informed the government that its conversion decision was contrary to applicable law and DoD procurement regulations. This letter also alerted the government to the possibility of legal action

to preclude the illegal conversion of distribution services to in-house performance if the government did not voluntarily act to address the situation.

38.  Negotiations between LABAT and the government to reach a satisfactory resolution of this situation ended unsuccessfully on October 15, 2004. That same day, LABAT was informed that the Government intended to proceed with its illegal conversion to in-house government performance of the distribution services at DDCN.

39.  As a result of Defendants' conduct, as described in the preceding paragraphs, LABAT has been and will be deprived of its right to a legally valid procurement process.

40.  In addition, Defendants' conduct, as described in the previous paragraphs, has resulted and will result in a dramatic loss of revenues and business opportunities for LABAT.

41.  Defendants' conduct substantially threatens the viability of an important business unit for LABAT. The injury that will befall Plaintiff as a result of Defendants' conduct is both substantial and irreparable, and Plaintiff has no adequate remedy at law.

42.  Defendants' decision to convert the DDCN operations to in-house personnel was made with full knowledge that such an action would cause LABAT substantial and irreparable injury.

43.  LABAT relied to its detriment on the provisions of, and procedural safeguards provided by, 10 U.S.C. § 2462, Part 169 of the DoD Regulations, Executive Order 12615, and OMB Circular A-76 (2003), all of which implemented the stated federal policy that commercial activities performed by private industry should not be converted to in-house performance except under limited

circumstances, not applicable here, or upon completion of a cost comparison study pursuant to OMB Circular A-76 (2003).

## COUNT I

44. LABAT repeats and realleges the allegations in paragraphs 1 through 43 above as though fully set forth.

45. Defendants' conduct and impending conduct in converting the DDCN operations to an Interim Government Operation pursuant to a Contracting Officer's determination and otherwise has violated and will violate 10 U.S.C. § 2462 (2004).

## COUNT II

46. LABAT repeats and realleges the allegations in paragraphs 1 through 43 above as though fully set forth.

47. Defendants' conduct and impending conduct in converting the DDCN operations to an Interim Government Operation pursuant to a Contracting Officer's determination and otherwise has violated and will violate Part 169 of the DoD regulations, 32 C.F.R. Part 169, exceeds Defendants' authority, and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706.

## COUNT III

48. LABAT repeats and realleges the allegations in paragraphs 1 through 43 above as though fully set forth.

49. Defendants' conduct and impending conduct in converting the DDCN operations to an Interim Government Operation pursuant to a Contracting Officer's determination and otherwise has violated and will violate Executive Order 12615, "Performance of Commercial Activities" (Nov. 19, 1987).

## COUNT IV

50. LABAT repeats and realleges the allegations in paragraphs 1 through 43 above as though fully set forth.

51. Defendants' conduct and impending conduct in converting the DDCN operations to an Interim Government Operation pursuant to a Contracting Officer's determination and otherwise has violated and will violate OMB Circular A-76 (2003).

## PRAYER FOR RELIEF

Wherefore, LABAT requests this Court to:

1. Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that:

   a) Defendants' conduct and impending conduct in converting the DDCN operations performed by LABAT to an Interim Government Operation is in violation of 10 U.S.C. § 2462 (2004).

   b) Defendants' conduct and impending conduct in converting the DDCN operations performed by LABAT to an Interim Government Operation is in violation of Part 169 of the DoD regulations, 32 C.F.R. Part 169; Executive Order 12615, "Performance of Commercial Activities" (Nov. 19, 1987); OMB Circular A-76 (2003); and the APA, 5 U.S.C. § 706.

2. Plaintiff further requests that this Court enter an order:

a)   Enjoining Defendants and in particular Donald H. Rumsfeld, Secretary of Defense, and/or his agents, Michael W. Wynne, Acting Under Secretary of Defense for Acquisition, Technology and Logistics; Vice Admiral Keith W. Lippert, Director of the DLA; Colonel Michael J. Lally, Director of the DDC; and Commander Joseph T. Sermarini of the DDCN from converting the DDCN operations performed by LABAT to an Interim Government Operation unless a solicitation is issued for a follow-on competition, the follow-on competition does not result in reasonable prices, in-house performance is feasible, and the conversion is justified by a cost comparison study performed in accordance with OMB Circular A-76 (2003).

b)   Enjoining Defendants and in particular Donald H. Rumsfeld, Secretary of Defense, and/or his agents, Michael W. Wynne, Acting Under Secretary of Defense for Acquisition, Technology and Logistics; Vice Admiral Keith W. Lippert, Director of the DLA; Colonel Michael J. Lally, Director of the DDC; and Commander Joseph T. Sermarini of the DDCN from converting the DDCN operations performed by LABAT to an Interim Government Operation without first complying with 10 U.S.C. § 2462, Part 169 of the DoD Regulations, Executive Order 12615, and OMB Circular A-76 (2003).

3.   Plaintiff further requests that this Court enter an order requiring Defendants to reimburse LABAT for its costs and expenses reasonably incurred in prosecuting this action, including reasonable attorneys' fees.

>Respectfully submitted,
>
>*[signature]*
>
>Thomas L. McGovern III (D.C. Bar No. 415698)
>Todd R. Overman (D.C. Bar No. 484970)
>Hogan & Hartson, LLP
>555 13th Street, N.W.
>Washington, DC 20004
>(202) 637-5784
>
>*Counsel for Plaintiff*
>*LABAT-Anderson Incorporated*

Dated: October 20, 2004